UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| TODD M. FREIDEMAN, | 4:17-CV-04039-KES |
| Plaintiff, | |
| | REPORT AND RECOMMENDATION |
| vs. | |
| NANCY A. BERRYHILL, ACTING COMM'R OF SOCIAL SECURITY; | |
| Defendant. | |

**INTRODUCTION**

Plaintiff, Todd M. Freideman, seeks judicial review of the Commissioner's

final decision denying him payment of disability benefits under Title II and Title

XVI of the Social Security Act.[1] Mr. Freideman has filed a complaint and has

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See, e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  In this case, Mr. Freideman filed his application for both types of benefits.  AR16, 228-35.  His coverage status for SSD benefits expires on December 31, 2018.  AR16.  In other words, in order to be entitled to Title II benefits, Mr. Freideman must prove he is disabled on or before that date.  For simplicity, this court cites to only one set of regulations because both are identical for purposes of the issues discussed herein.

requested the court to reverse the Commissioner's final decision denying him disability benefits and to enter an order awarding benefits. Alternatively, Mr. Freideman requests the court remand the matter to the Social Security Administration for further hearing. The Commissioner asks this court to affirm its decision below. The matter is fully briefed and has been referred to this magistrate judge for a report and recommendation. For the reasons more fully explained below, it is respectfully recommended to the district court that the Commissioner's decision be reversed and remanded.

### JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter was referred to this magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B), the October 16, 2014, standing order and order referring case dated January 19, 2018, of the Honorable Karen E. Schreier, United States District Judge.

### FACTS

**A.    Procedural History**

Todd Freideman applied for Title II and Title XVI benefits on September 26, 2013, alleging a disability onset date of October 23, 2013. AR228, 230. Mr. Freideman's claims were denied initially on February 5, 2014, and upon reconsideration on May 2, 2014. AR142, 151. Mr. Freideman requested a hearing before an Administrative Law Judge (ALJ) and a video hearing was held on November 5, 2015, before ALJ Hallie E. Larsen. AR 14-15, 16.

At the hearing, Mr. Freideman, Lynn Pesky, and David Perry, a vocational expert, testified.  AR 65, 68-90.  Mr. Freideman was represented by counsel, however, not his current lawyer.  On December 16, 2015, the ALJ issued a decision denying benefits.  AR13-31.  The ALJ concluded Mr. Freideman was never disabled at any time from September 26, 2013, through the date of the ALJ's decision.  AR16.

Mr. Freideman then requested the Appeals Council to review the ALJ's decision.  The Appeals Council denied the request for review on January 26, 2017, making the ALJ's decision the final agency decision.  AR1. Mr. Freideman thereafter filed his appeal of the Commissioner's decision with this court on March 16, 2017.  Docket No. 1.

**B.    Medical and Occupational Facts[2]**

Todd Freideman was born in 1967. AR 493. He has a fraternal twin and a younger brother. AR 500. His mother reported that as a child he was diagnosed as hyperactive and had a short attention span, stuttered, and was mentally and physically abused by his father. AR 371. He did not complete high school. AR 493, 500. He worked construction. AR 493.  During the 1980's recession, he moved from Pennsylvania to Huron to find employment. AR 493. He abused alcohol, but quit in about 1985. AR 607, 620. He has two daughters and is divorced. AR 493, 607.

---

[2] Mr. Freideman's counsel provided an extensive and detailed statement of facts which the Commissioner did not dispute.  The court's statement of facts, then, is taken heavily from Mr. Freideman's own statement at Docket No. 15 pp. 2-16.

From 1993 through 2004, Mr. Freideman's earnings were low to moderate but steady. AR 241. He worked for Dakota Pork in Huron "from 1990 to 199" [sic], and as a smokehouse operator at LSI, Inc., in Alpena from March 1996 until March 2005. AR 360; *cf.* detailed earnings record at AR 242, identifying employers at AR 590.

On March 29, 2005, an MRI revealed a large disc herniation at L3-4, filling the neural foramen and causing severe foraminal stenosis. A smaller hernia at L5-S1 caused borderline central stenosis. AR 589. Matthew Reynen, MD, orthopedic surgeon, advised against conservative treatment but Mr. Freideman wanted to try it. AR 587. Chiropractic treatment plus Vicodin, Celebrex, and a Medrol Dose Pack did not help and by May Mr. Freideman was ready for surgery.  AR 587, 595.

Dr. Reynen's May 23, 2005 operation report described a large extruded disc that flattened the nerve root. AR 581. Six weeks post excision of the L3-4 disc, Mr. Freideman had achiness in the left buttock and thigh, similar to before surgery but less intense. AR 600. Ten weeks post excision, he felt very limited, was unable to stand or walk for prolonged periods, and had difficulty bending and lifting. AR 602. In October 2005, 20 weeks post excision he had symptoms but said he felt ready to return to work and Dr. Reynen certified that he could work. AR 604-05. However, Mr. Freideman did not return to work that year: his last earnings from LSI, Inc., were in 2005 when he was paid $6101, less than 25 percent of his annual wages there, consistent with working about one quarter. AR 242.

4

For two years, for reasons not revealed by the record,[3] Mr. Friedeman received services from the Huron Community Counseling Services CARE[4] program for the mentally ill. AR 493. He apparently did sheltered work[5] for Community Counseling Services, earning $2478 in 2006 and $1186 in 2007[6]. AR 241.

In 2007 he worked briefly (earning $2046) at Huron Crossroads as a hotel restaurant prep cook. AR 243, 298. He resumed substantial gainful activity ("SGA") when he started working at Wal-Mart in the second half of 2007. AR 243.

He had filed a claim for SSD[7] in January 2006. AR 94. By the time it reached hearing in January, 2008, Mr. Freideman was working full-time at Wal-Mart; he requested and received an ALJ's permission to withdraw his Application.[8] AR 62-63.

---

[3] A rheumatologist reported in December 2011 that Freideman had a medical history of depression and anxiety. AR 620.

[4] "Comprehensive Assistance with Recovery and Empowerment" is a program for persons who have met the severely mentally ill criteria. http://www.ccs-sd.org/care-program/, accessed January 31, 2018.

[5] Freideman testified, "They used to have sheltered employment." AR 81.

[6] The substantial gainful activity (SGA) amounts for those years were $810 and $830 per month, respectively. 20 CFR § 404.1574(b)(2).

[7] See Footnote 1, *supra*.

[8] Apparently no one told him that he was entitled to consideration of a closed period of disability, if he had a 12-month period of disability. 20 CFR § 404.1509.

Mr. Friedeman worked at Wal-Mart Tire Lube Express from July 2007 to February 2013. AR 243, 287, 360. He was a service technician and installed new tires, repaired tires, and changed oil. AR 360. On the side he hung drywall. AR 620.

In October 2011, Mr. Freideman presented to the Huron Clinic complaining of right hip pain starting two years before and worsening for eight months. AR 653. He also suffered intermittent back pain, better since his disc surgery, id., and left foot pain related to degenerative joint space narrowing in the first metatarsophalangeal (MTP) joint. AR 652. Fatigue had been present for years but he could stay awake with a candy bar or caffeine. AR 645. Laboratory studies revealed a positive HLA B27[9] antigen. AR 657.

Mr. Freideman was referred to Gregory Mumm, MD, a rheumatologist. Dr. Mumm recorded complaints of low back and lumbar pain, myalgias and arthralgias in the forearms, shins, ankles, and feet, generalized stiffness lasting 90 minutes in the morning, longstanding fatigue, and disrupted sleep. AR 619. Dr. Mumm noted a history of depression and anxiety. AR 620. Review of systems was positive for constitutional symptoms[10] – subjective fevers, 20-

---

[9] Presence of HLA-B27 (human leukocyte antigen) suggests a greater-than-average risk for certain autoimmune disorders, in particular spondyloarthritis. Spondyloarthritis includes ankylosing spondylitis, arthritis related to Crohn's or ulcerative colitis, psoriatic arthritis, reactive arthritis, sacroiliitis, and uveitis. The presence of HLA-B27 does not always signal disease. MedlinePlus's on-line *Medical Encyclopedia.* "HlA-B27 antigen." https://medlineplus.gov/ency/article/003551.htm, accessed January 31, 2018.

[10] Cf. list of constitutional symptoms, 20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00 Autoimmune Disorders.

pound weight loss, fatigue, and weakness – and bouts of red eyes, light sensitivity, dry mouth, heart murmur, shortness of breath, nausea, abdominal pain, heartburn, difficult urination, rashes, muscle tenderness and weakness, cold sensitivity, paresthesias, memory loss, sleep disruption, and the above-noted depression and anxiety. AR 620. Dr. Mumm's impression was chronic widespread pain. AR 619.

> He has innumerable somatic complaints and pains that are more diffuse and muscular in nature and prominent among these complaints are longstanding fatigue, disrupted sleep quality, and a number of other constitutional problems. A myofascial pain syndrome like fibromyalgia would some [sic] most likely to account for all of these symptoms.

AR 619.

Dr. Mumm recommended treatment "along the lines of a myofascial pain syndrome" with aerobic exercise, sleep hygiene, medications like Cymbalta or Savella, Gabapentin, Lyrica, Tramadol, and tricyclic antidepressants. Id.

Dr. Mumm noted mild degenerative joint disease of the first MTP joint. AR 620. He noted Mr. Freideman's complaint of hip pain with weight bearing and rotation, and an October 2011 x-ray finding of mild loss of joint space and a somewhat broad femoral neck. Dr. Mumm said a CAM-type impingement (see fn. 13) or labral[11] pathology were considerations. AR 619.  He recommended an MRI arthrogram to diagnose the hip pain. Id.

---

[11] The acetabular labrum is a fibrocartilaginous structure that outlines the acetabular socket of the hip joint. The hip labrum functions to absorb shock, lubricate the joint, distribute pressure and aid stability. The acetabular labrum plays a role in preventing premature arthritis. Etiologies of labral tears include femoracetabular impingement and hip dysplasia. Free nerve endings and

Mr. Freideman was referred to Erik Peterson, MD, CORE Orthopedics. AR671. Imaging of the hip in the first quarter of 2012 confirmed the presence of an acetabular labral tear secondary to cam[12] type femoracetabular impingement. AR 671-72, 675-77, 694-95.

_____

sensory nerve end organs in the labrum produce pain, pressure, and deep sensation; and labral tears present with anterior hip or groin pain, sometimes buttock pain. Commonly, the injury goes undiagnosed for two years. The "gold standard" diagnostic test is magnetic resonance arthrography. *Curr Rev Musculoskelet Med.* 2009 Jun; 2(2): 105-117. Groh and Herrera. "A comprehensive review of hip labral tears." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2697339/, accessed January 31, 2018.

[12] Cam impingement occurs because the ball-shaped end of the femur (femoral head) is not perfectly round. This interferes with the femoral head's ability to move smoothly within the hip socket. http://www.ortho.wustl.edu/content/Patient-Care/3206/Services/Sports-Medicine/Overview/Hip/Hip-Impingement.aspx, last accessed January 31, 2018.
"Femoroacetabular impingement [FAI] is a collection of bony morphologic abnormalities of the hip joint that result in abnormal contact during motion. Cam-type FAI relates to a non-spherical osseous prominence of the proximal femoral neck or head-neck junction.... Patients with FAI present with chronic, deep, or aching anterior groin pain most commonly in the sitting position, or during or after activity. Patients might also experience occasional sharp pains during activity.... [D]elays and inappropriate treatment occur despite the fact that patients with FAI present with fairly consistent signs and symptoms and identifiable abnormalities on plain film radiographs.... The main goal of surgery is to improve fluidity of motion of the hip joint by alleviating the impingement of the femoral head and neck against the ring of the acetabular labrum. Therefore, surgery for FAI aims to correct the areas of ... bony femoral head-neck protrusion (cam FAI) to restore the normal clearance within the hip joint. Operative management of FAI has been shown to be effective in providing symptomatic relief and improving function, and it is substantially better than non-surgical management. It is currently unknown if any treatments of FAI will alter the natural history of the disease progression of OA or future need for hip replacement." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4677941/, last accessed January 31, 2018.

On June 8, 2012, Dr. Peterson reported a right hip arthroscopic labral repair with anchors; acetabular osteoplasty including rim trim, chondroplasty, and microfracture of the acetabular Grade 4 chondral defect; and osteoplasty of the femoral head cam lesion. AR 624. Dr. Peterson said it was necessary also to perform a capsulotomy "when I entered the joint to connect the two portals, and I did see some synovitis around the hip capsule, certainly indicating a clinically symptomatic tear." "He had a very large, impressive, cam lesion on the superior and mid anterior part of the femoral head and neck area." It was necessary to resection 20-25 percent of the femoral head junction to return it to a more normal shape. AR 625.

A month after surgery Mr. Freideman complained of lower-leg weakness. He had obvious quadriceps atrophy and a hard time holding a straight-leg-raising position. AR 681.

In October, 2012, Mr. Freideman complained of groin pain in his <u>left</u> hip. In addition he had numbness and tingling in the left foot that sounded like possible recurrent disc herniation. Left hip impingement signs were positive and he had an "iliopsoas deep groin snap." AR 389.

Lumbar spine MRI showed degenerative changes at L2-3, L3-4, L4-5, and L5-S1 and a small annular tear at L4-5. AR 383. Disc extrusion appeared to contact the exiting right L3 nerve root. This could be granulation tissue from the prior lumbar spine surgery. AR 382. Imaging of the left hip showed significant cartilage disease and trace bursitis. AR 386. Dr. Peterson said "leftward symptoms" could be due to granulation tissue from the prior

discectomy but he found no source of radiculopathy. AR 411.  In November 2012, he injected the left hip for diagnostic and therapeutic purposes. AR 411. After this, the orthopedic record is silent for ten months.

In March, 2013, Dr. Lyle Christopherson, Community Counseling psychiatrist, treated Mr. Freideman with Ambien for his sleep disorder, which a one-time otolaryngologist said in May, 2013, could have a possible psychiatric contribution (without, however, describing behaviors and apperance). AR 392-93, 669.

In August 2013, Dr. Peterson's orthopedic PA reported Mr. Freideman's complaints of catching, almost snapping, in the left groin and deep-seated joint pain that was very debilitating. AR 388. He had an antalgic, slow gait, was very cautious moving the hip, had "snapping in the groin consistent with iliopsoas bursitis," and had painful impingement tests. Id. Range of motion was reduced and the hip was "very irritable." Id. Imaging showed a labral tear without complete detachment and a focal chondral defect in the femoral head. Id.

Mr. Freideman's Walmart duties were changed, and he served as a "service writer/greeter" from February, 2013, to October 23, 2013. AR 287.

On October 16, 2013, surgery was scheduled for October 28, 2013. AR394. On this day, Mr. Freideman applied for SSD, stating that he had been unable to work for several days each month and had been using his sick leave and vacation pay. AR 274. The field office worker reported, "Claimant was very defensive of all questions asked.... A couple times he repositioned himself from what appeared to be pain in the hip." AR 279.

Dr. Peterson reported the left hip operation: arthroscopic labral repair, 3-anchor; arthroscopic osteoplasty of femoral head to treat cam impingment; arthroscopic iliopsoas release; left arthroscopic chondroplasty of the acetabular rim, and left iliopsoas tenotomy. Dr. Peterson's post operative diagnosis was torn anterior superior acetabular labrum, deep chondral labral separation secondary to cam-type femoroacetabular impingement, grade 3 chondromalacia of the left acetabular rim, and left iliopsoas bursitis with internal snapping hip. Findings included, again, synovitis in the capsule. Total tear size was 3 to 3.5 cm. The patient had a "quite prominent cam abnormality on the anterior femoral head-neck junction, which was sculpted into a more normal shape, sculpting around the spurring at the rim." AR 401-02.

Post operatively, Mr. Freideman engaged in physical therapy and complained of pain, weakness, and recurrent problems with his right hip. AR422, 427, 430-36. Dr. Peterson injected the right hip on December 4, 2013 and continued the left hip therapy program. AR 403, 438-40, 442-43. Mr. Freideman underwent another injection of the right hip on December 19, 2013. AR 415. On this date, Dr. Peterson's PA wrote a letter that Mr. Freideman was not ready to return to work, but hopefully could return toward the end of February: "He is unable to do repetitive motion, steps, stairs, climbing, weightbearing for prolonged periods, or sitting prolonged periods. I have him in a PT program." AR 468. Mr. Freideman told his physical therapist that he struggled with both hips equally. AR 447, 449.

11

On January 21, 2014, Mr. Freideman underwent a third injection of the right hip. At this point, Dr. Peterson noted that he complained most of debilitating sacral pain and discomfort into his tailbone, and had point specific pain on the coccyx. AR 451. Dr. Peterson's PA wrote to Jonathan Stone, MD, a physiatrist, referring the patient for debilitating longstanding coccyx/sacral pain. AR 465.

Dr. Stone saw Mr. Freideman on February 28, 2014, and recorded a history of a fall from a ladder on uncertain dates: "2002 or maybe even before in the Spring of 1994. He also had a fall in 1999. He had repeated falls in 2010 and 2013." AR 455. Mr. Freideman described his coccydyneal pain as 7.8 on the 0-10 scale, stabbing and burning in nature. He also described numbness and tingling down his left leg, and pain that was worse with walking, standing, lying down, bending over, sitting, cold weather, leaning forward, increased activity, and stretching. AR 455.

Dr. Stone noted the positive HLA-B27. AR 455. He noted the history of treatment and physical therapy without much benefit. AR 455. Complaints included dizziness and headaches, numbness in the left leg and foot, tremulousness, memory problems, and weakness. AR 455. The patient reported pain in the back, feet, hips, legs, neck, shoulders. AR 453. Dr. Stone reported mildly restricted affect and limited insight, but offered no further description. He diagnosed coccydynia. AR 453. On March 5, 2014, Mr. Freideman underwent a caudal injection. AR 459. Afterward, he was "probably better than he has been in a long time," according to Dr. Peterson.

12

AR 462. "I do not want to tempt fate by putting him back to work because the repetition will surely flare his pain up." AR 462. Dr. Peterson estimated that Mr. Freideman could return to work on July 31, 2014. AR 461.

On July 1, 2014, Beth Kelsey, Ed.D., QMHP, LPC-MH, a psychologist at Huron's Community Counseling program, evaluated Mr. Freideman. AR 493. She reported, "Todd was in the CARE program from 2006-11." AR 493. Dr. Kelsey stated, "he started going downhill emotionally following two hip surgeries." AR 493. "He was a little slow in his responses. He seems to think before he speaks. He reported that he has occasional psychotic thoughts. He reported that he cries a lot." AR 494. She diagnosed Major Depressive Disorder, Recurrent, Severe, with Psychotic Features. AR 495.

Following Dr. Kelsey's evaluation, Lynne Peskey of Community Counseling provided 25 case management sessions.[13] Therapist Andrew

---

[13] July 2, 2014 (AR 496-97); July 16, 2014 (AR 497-98); July 30, 2014 (AR 502-03); August 5, 2014 (AR 503-04); August 21, 2014 (AR 508-09); September 10, 2014 (AR 510-11); September 24, 2014 (AR 513-14); October 8, 2014 (AR 516-17); October 22, 2014 (AR 517-10); November 5, 2014 (AR 518-19); December 3, 2014 (AR 520-21); December 31, 2014 (AR 522-23); January 14, 2015 (AR 523-24); January 28, 2015 (AR 524-25); February 11, 2015 (AR 525-26); March11, 2015 (AR 529-30); March 25, 2015 (AR 531-32); April 22, 2015 (AR 535-36); June 3, 2015 (AR 541-42); June 17, 2015 (AR 549-50); July 15, 2015 (AR 555-56); July 29, 2015 (AR 558-59); August 12, 2015 (AR 711-12); September 9, 2015 (AR 717-18; September 23, 2015 (AR 721-22).

McDade, LSW, provided five sessions of individual therapy.[14] Therapist

Gertrude Larsen, MA, provided 24 sessions of individual therapy.[15]

Lyle Christopherson, DO, psychiatrist, saw Mr. Freideman eight times.[16]

He provided medication management following his initial 60-minute interview

and examination on July 28, 2014. AR 499-501. Dr. Christopherson reported

that he had last seen Mr. Freideman in 2010 when he had a history of mood

issues, sleep issues, and alcoholism in remission. AR 500. Dr. Christopherson

noted that a lot of things had happened recently: the patient had had extensive

orthopedic work on both hips and was in chronic pain. He had done physical

labor his entire life. "He is a little bit of an odd duck." Dr. Christopherson did

not elaborate. "He does complain of problems with memory. He is kind of

circumstantial and kind of runs things over and over and over again. That is

---

[14] July 23 2014 (AR 498-99); August 6, 2014 (AR 504-05); August 12, 2014 (AR 505-06); August 28, 2014 (AR 509-10); September 29, 2014 (AR 514-15).

[15] March 25, 2015 (AR 530-31); April 2, 2015 (AR 532-33); April 9, 2015 (AR 533-34); April 16, 2015 (AR 534-35); April 24, 2015 (AR 536-37); April 27, 2015 (AR 537-38); May 6, 2015 (AR 538-39); May 13, 2015 (AR 539-40); May 20, 2015 (AR 540-41); June 10, 2015 (AR 545-46); June 18, 2015 (AR 550-51); June 25, 2015 (AR 551-52; July 2, 2015 (AR 552-53); July 9, 2015 (AR 553-54); July 14, 2015 (AR 554-55); July 21, 2015 (AR 556-57); July 28, 2015 (AR 557-58); August 4, 2015 (AR 561-62); August 20, 2015 (AR 712-13); August 27, 2015 (AR 713-14); September 3, 2015 (AR 716-17); September 17, 2015 (AR 719-20); September 21, 2015 (AR 720-21; September 28, 2015 (AR 722-23).

[16] March 11, 2013 (AR392-93); July 28, 2014 (AR 499-501); August 18, 2014 (AR 506-08); September 22, 2014 (AR 511-12); June 8, 2015 (AR543-45); August 4, 2015 (AR 562-64); September 1, 2015 (AR 714-15); September 29, 2015 (AR 723-25).

kind of the way he's always been but it's worse now. He clearly is somewhat depressed endorsing 20 points on the PHQ-9."[17] AR 500. Dr. Christopherson provided psychiatric medical management over the course of the next six visits.

Community Counseling also provided group activities and Mr. Freidman participated on July 31, 2015, (AR 559-61) and September 10, 2015 (AR 718-19).

Dr. Christopherson thought that owing to early, corroborated history of carbon monoxide poisoning,[18] cognitive testing was warranted. AR 545. In June, 2015, Dr. Christopherson referred Mr. Freideman to Gennea Danks, Ph.D., QMHP, for cognitive testing. AR 548. Dr. Danks thought that DDS[19] would not accept her testing unless they requested it first, so she instead did "a very thorough clinic interview" lasting 120 minutes. AR 547-48.

During the 2014-15 period, Mr. Freideman engaged in sporadic work. In 2014, Hamilton Drywall & Painting paid him $1650. AR 256. His fraternal twin William Freideman paid him $1200. AR 260. In March, 2015, Hamilton Drywall

---

[17] Patient Health Questionnaire inquiring about anhedonia and multiple depression signs and symptoms, trouble concentrating, feeling tired, etc. See http://www.cqaimh.org/pdf/tool_phq9.pdf, accessed January 31, 2018.

[18] "[C]arbon monoxide is a well-documented neurotoxicant, and indoor exposure to this substance has now been linked to deficient neurobehavioural performance in children.... The persistent decrements in intelligence documented in children, adolescents, and young adults exposed in early life to neurotoxicants could presage the development of neurodegenerative disease later in life." *Lancet Neurol.* 2014 Mar; 13(3); 330-338. Grandjean et al. "Neurobehavioral effects of developmental toxicity." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4418502/, last accessed January 31, 2018.

[19] South Dakota Disability Determination Services.

& Painting paid Mr. Freideman $767.50. AR 258. On November 2, 2015, an employer sent Mr. Freideman a text message: "Todd if Walmart offers you a job don't turn it down you do not do good around people everything around turn to s--- I cannot afford to have you around good bye." Mr. Freideman appeared to have no idea what his problem was, getting along with others. All he could say is, "I'm not good with people." AR 71-72.

### C.    Mr. Freideman's Reports of His Symptoms and Limitations

The record contains a "function report" and Todd Freideman's testimony. In his function report, Mr. Freideman described daily activities: making sandwiches, taking his therapy dog outside, laundry and cleaning (performed slowly, with tasks broken up, described at AR 321), and shopping for groceries twice a month, AR 308-09. He reported a restricted daily routine at AR 326-28.

He had problems walking and standing. AR 315. "I drag my feet and swing my legs instead of lifting them. The pain through my hips buttocks tail bone and lower back really increase in very short amount of time and make it very difficult for me about 2 minutes, I can only walk for about 2 blocks before I need to stop and rest." AR 318. He testified that he walked his dog 15-20 minutes. AR 75. He had difficulty with stairs and stayed away from stairs as much as possible. AR 317, 319. He had difficulty getting in and out of the shower. AR 314. He showered infrequently. AR 323.

He testified that he could stand about 15 minutes. AR 75. He could not squat because of pain in his hips, buttocks, tailbone, and up through his lower back. AR 317. Bending and kneeling were almost as painful as squatting.

16

AR317, 319. He stated that he could sit 5-15 minutes before his tailbone and hips really started to bother and he needed to get up. AR 319.

Someone else handled his money, because this added to his stress. AR308-09. He watched movies, listened to music, visited with his brother who had multiple sclerosis, and maybe once a week talked on the phone with his children. AR 310.

He said he went no place on a regular basis; he didn't have the energy. Id. He said, "I can't go to to many places without people looking at me funny (strange) looks because I walk funy [sic] and slow, drag my feet, walk like Im [sic] drunk and I don't drink at all (Alcohol - quit 2005)[.]" AR 322.

He had problems lifting a bag of potatoes that weighed 10 pounds (function report) or 20 pounds (testimony). AR 75, 317. He claimed that he could pay attention for about an hour. AR 75, 311. But concentration was not good and when somebody asked a question "it takes me quite awhile to anser [sic]." AR 315. He could handle written instructions "sometimes good if I can reference it," but spoken instructions "[n]ot that good I forget what was said a lot of times." AR 311.

He testified that when he was trying to hang drywall (apparently in 2014-15, AR 19-20), he did not come late or leave early, but was given six to eight 20-30-minute breaks. AR 78.

He claimed that he had never been fired from a job because of problems getting along with other people. AR 312. He also said that 90 percent of the time he was in a lot of pain that "makes a person get agravated easy and makes

17

me be not good company at times." AR 316. He testified, "I get really irritable. I'm not good with people." AR 76. He testified, "Sometimes I just couldn't handle the other people coming to the job to load the job with other things that had to be there and had to go out and cool off. I'm not good with people." AR78-79. He testified that he could not get along with "[c]oworkers and my brother, and other people showing up to the job." AR 79. As for responding to criticism, Friedeman testified that he was "probably pretty argumentative. I'm not good with people. I'm not good with criticism." AR 79. He acknowledged disagreements or arguments with co-workers when "I had to go cool off. I could not continue doing what I was doing." AR 80.

He said he could handle changes in routine pretty good and "At times its difficult to adjust." AR 312.

## D.    The ALJ's Decision

Initially the ALJ found that the claimant was insured for benefits through December 31, 2018.[20] AR 16.  The ALJ found at step one[21] that Mr. Freideman had not engaged in SGA since the date he applied for benefits, September 26, 2013.  AR19.  Inconsistently, the ALJ went on to say that no

---

[20] To receive Title II disability, a claimant must have earned "insured status" by paying into the system for the requisite number quarters, and must meet the "recency" requirement — i.e., prior to the date of disability onset the claimant (with certain exceptions) must have 20 quarters of coverage out of 40. 20 CFR §§ 404.110, 404.130, 404.321.

[21] The question of whether a claimant is entitled to disability benefits is governed by a five-step analysis, discussed in further detail below in subsection B of the DISCUSSION section of this opinion.

evidence refuted the field office determination that Mr. Friedman engaged in SGA until October 23, 2013.  Id. Therefore, this was the earliest date he could be found disabled.[22] AR 19.

The ALJ found at step two that Mr. Freideman had the following severe impairments:  degenerative disc disease, lumbar spine; fibromyalgia; anti-social personality traits; and major depressive disorder.  AR20.

At step three, the ALJ found Mr. Freideman did not have an impairment, or a combination of impairments, that met or equaled a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1.  Id.  In this regard, the ALJ considered but rejected listings described at the following sections:  1.02, 1.04, and 12.04. Id.  The ALJ recited activities of daily living engaged in by Mr. Freideman as evidence he did not meet any listing.  AR20-21.  In her written opinion, the ALJ did not specifically mention or consider fibromyalgia as an impairment at step three nor did she discuss the listing at section 14.09D.  Id.

At step four, the ALJ determined Mr. Freideman's residual functional capacity (RFC) included the ability to do light work.  AR22.  The ALJ described Mr. Freideman's RFC as follows:  "lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit, stand and/or walk six hours out of an eight-hour workday with normal breaks; never climb ladders/ropes/scaffolds; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; and frequently balance. Mentally, he is able to understand, remember and carry out short, simple

---

[22] The court notes the ALJ's contradictory findings in this footnote in the hopes that Commissioner will correct the error on remand.

instructions, interact appropriately with co-workers on an occasional basis, and have no contact with the general public as part of the job." AR22. Given this RFC, the ALJ concluded there was no past relevant work Mr. Freideman was able to perform. AR29.

In arriving at Mr. Freideman's mental RFC, the ALJ discounted each of Mr. Freideman's treating mental health providers. The ALJ assigned "little weight" to Dr. Christopherson's opinions (at AR 726-28); "limited weight" to the opinions of Gertrude Larsen, MA (at AR 732-34), described by the ALJ as "claimant's case manager, ... for a short period of time"; "little weight" to the opinion of Gennea Danks, Ph.D. (at 729-31); and "little weight" to the testimony of Lynne Peskey, the case manager (at AR 83-85). AR 26-28. The ALJ assigned "significant weight" to the DDS non-examining opinions, noted that they had found mental impairments non-severe, and noted that records received subsequent to their review supported a finding of severe mental impairments. AR 28.

At step five, the ALJ concluded that given Mr. Freideman's age (46 years old), education (high school), work experience, and RFC, there were jobs he could perform that exist in significant numbers in the national economy. Id. Specifically, relying on the vocational expert's ("VE") opinion, the ALJ found Mr. Freideman retained the ability to perform the jobs of document scanner, garment sorter, and laundry worker. AR30.

In discussing her step five analysis, the ALJ noted that "[f]ibromyalgia has been suspected as his symptoms are consistent with fibromyalgia, but the

record contains no formal evaluation or diagnosis of fibromyalgia. . . . The claimant is prescribed medications for mental health symptoms, but he takes no pain medication." AR24.

**E.    Issues Raised by Mr. Freideman in this Appeal**

Mr. Freideman raises the following five issues before this court:

1.    Whether the ALJ erred in determining that Mr. Freideman's combined impairments, including his fibromyalgia, did not meet or equal a listing, in particular Listing 14.09D.

2.    Whether the ALJ assigned proper weight to medical opinion evidence concerning Mr. Freideman's mental health and functioning.

3.    Whether the ALJ erred as a matter of law by performing the psychiatric review technique without the assistance of a mental health professional.

4.    Whether the ALJ erred in failing to develop the psychological evidence from Dr. Gennea Danks.

5.    Whether the ALJ's formulation of Mr. Freideman's mental RFC complied with Eighth Circuit law.

## DISCUSSION

**A.    Standard of Review.**

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627

(8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627.   The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Woolf v. Shalala</u> 3 F.3d 1210, 1213  (8th Cir. 1993).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311

(8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether

the ALJ applied an erroneous legal standard in the disability analysis.

Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d

852, 853 (8th Cir. 1998)(citations omitted).   The Commissioner's conclusions

of law are only persuasive, not binding, on the reviewing court.  Smith, 982

F.2d at 311.

## B.    The Disability Determination and the Five-Step Procedure.

Social Security law defines disability as the inability to do any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment

must be severe, making the claimant unable to do his previous work, or any

other substantial gainful activity which exists in the national economy.

42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is

disabled.  This sequential  analysis is mandatory for all SSI and SSD/DIB

applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 404.1520.  When a determination that an applicant is or is not disabled can

be made at any step, evaluation under a subsequent step is unnecessary.

Bartlett v. Heckler, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as

follows:

**Step One:**    Determine whether the applicant is presently engaged
in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the

23

applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments  the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett 777 F.2d at 1320, n.2.  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's

RFC, along with his age, education, and past work experience.  20 C.F.R. § 1520(f).

## C.    Burden of Proof.

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting at step five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.    Fibromyalgia at Step Three and Beyond

The ALJ found fibromyalgia to be one of Mr. Freideman's severe impairments at step two of the analysis.  AR20.  The ALJ, however, never mentioned Mr. Freideman's fibromyalgia at step three, when determining whether his combined impairments met or equaled a listed impairment. AR20-21.  Then, at steps four and five, when evaluating Mr. Freideman's fibromyalgia, the ALJ discounted the condition by stating that Mr. Freideman was never formally diagnosed with fibromyalgia.  AR24.  The ALJ noted, in this

regard, that Mr. Freideman takes no pain medication.  Id.  Of course,

Mr. Freideman *was* taking medication for his chronic pain.  He was prescribed

and appears to have faithfully taken Cymbalta (AR544), which is one of six

drugs Dr. Greg Mumm suggested he should be prescribed for his myofascial

pain syndrome (AR619).

Before this court, Mr. Freideman claims the ALJ erred because she did

not comply with SSR 12-2p concerning the evaluation of the impairing effects

of fibromyalgia.  The Commisioner argues the ALJ did not have to comply with

SSR 12-2p because Mr. Freideman never demonstrated that a treating medical

source ever made a formal evaluation or diagnosis of fibromyalgia.  The

Commisioner characterizes the ALJ's finding of severe fibromyalgia at step two

as a "harmless" "scrivner's error" which it urges the court to disregard.

The Commissioner also points out that Mr. Freideman never asserted

fibromyalgia as an impairment either in his application or at the hearing.  The

Commisioner asserts the ALJ has no duty to investigate an impairment that is

not asserted in the application or at the hearing.  Pena v. Chater, 76 F.3d 906,

909 (8th Cir. 1996) (quoting Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th

Cir. 1993)).  Mr. Freideman counters that the ALJ must consider all

impairments that appear in the evidence, whether or not they are alleged as a

basis for disability.  20 C.F.R. § 404.1512(a) and (b).  Fibromyalgia was in the

evidence before the ALJ so she was bound to consider it he argues.  As to this

latter argument, the court agrees.

The reference to fibromyalgia originates in the records from Dr. Gregory Mumm, a rheumatologist.  Dr. Mumm saw Mr. Freideman for the first time on December 13, 2011, on referral by Sarah Goral for evaluation of chronic pain. AR619.  On that date, Mr. Freideman complained of widespread chronic muscle and joint pain present fairly consistently, stiffness upon waking in the morning, disrupted sleep quality, fatigue, and finding physical activity "quite exhausting."  Id.  In Mr. Freideman's medical history, Dr. Mumm listed *inter alia* depression and anxiety, degenerative disc disease with history of discectomy at L3, longstanding insomnia and fatigue.  AR620.  Dr. Mumm recorded Mr. Freideman's family history to include relatives with degenerative disc disease, ankylosing spondylitis, gout, and fibromyalgia.  Id.

Upon examining Mr. Freideman physically, Dr. Mumm noted no actively swollen joints in the hands, wrists, or elbows, but some tenderness in the DIP[23] joints of the hands and forearms.  Id.  Mr. Freideman had discomfort in hip range of motion when his hips were externally rotated.  AR621.  There was no swelling in the foot and ankle, though there was generalized tenderness.  Id. Mr. Freideman was mildly tender upon squeezing his metatarsophalangeal joints.  Id.  Tenderness was noted in the lumbar spine and paraspinal muscles. Id.  Tender point exam revealed mild tenderness in five locations:  the neck, periscapular regions, and lumbar paraspinal muscles as well as milder

---

[23] "DIP" refers to the distal interphalangeal joint, which is the joint in the finger closest to the fingertip.  The joint where the radius is attached to the ulna at the wrist is called the distal radio-ulnar joint, just adjacent to the heel of the palm of the hand.

tenderness down in the distal thighs and shins.  Id.  The total number of

tender points was not recorded by Dr. Mumm.  Id.

Dr. Mumm had some lab work done.  AR621  Mr. Freideman's HLA-B27

test was positive, indicating he is at an increased risk of developing certain

autoimmune diseases.  See https://labtestsonline.org/tests/hla-b27, last

checked Jan. 25, 2018.  If the patient also has chronic pain, inflammation, or

degenerative changes to bones, a positive HLA-B27 test may support a

diagnosis of ankylosing spondylitis, reactive arthritis, or some other

autoimmune disorder, especially if the patient is a male and first experienced

symptoms before age 40.  Id.  Mr. Freideman was 44 at the time of these lab

tests, but his medical records demonstrate he had been experiencing chronic

pain since at least the age of 38.  See AR589, 595.  Dr. Mumm also tested

Mr. Freideman for rheumatoid factor, which was negative.  AR621.

Rheumatoid factor is an antibody present in about 80 percent of adults who

have rheumatoid arthritis.  See

https://www.medicinenet.com/rheumatoid_factor/article.htm#what_is_the_no

rmal_range_for_rheumatoid_factor, last checked Jan. 25, 2018.

Based upon the information garnered from Mr. Freideman, the lab tests,

and the physical examination, Dr. Mumm recorded some "impressions," but

did not record any "diagnoses."  AR619.  In his "impressions," he stated:

> Chronic pain, widespread in nature with reassuring joint and spine
> exam.  He has a positive HLA-B27, but I think it is very unlikely
> that this is an inflammatory back pain syndrome like ankylosing
> spondylitis.  He has innumerable somatic complaints and pains
> that are more diffuse and muscular in nature and prominent
> among these complaints are longstanding fatigue, disrupted sleep

> quality, and a number of other constitutional problems.  A
> myofascial pain syndrome like fibromyalgia would some [sic] most
> likely to account for all of these symptoms.

AR619.  Dr. Mumm's recommendations as of the conclusion of this visit were

to arrange an MRI of Mr. Freideman's pelvis, to continue him on naproxen for

the time being, and that he be prescribed Cymbalta or one of five other

suggested drugs for his myofascial pain syndrome.  Id.  As noted above,

Mr. Freideman followed Dr. Mumm's suggestion to obtain a Cymbalta

prescription.  AR544.

On January 13, 2012, Dr. Mumm met with Mr. Freideman telephonically

to go over the results of his MRI.  AR622.  Dr. Mumm's conclusions were

documented in a letter to Mr. Freideman.  Id.  The MRI showed mild

degenerative changes of the sacroiliac joints, but no evidence of sacroilitis.  Id.

Dr. Mumm believed this finding was not contributing in a major way to

Mr. Freideman's pain.  Id.  The MRI did, however, reveal a possible right labral

tear, which Dr. Mumm said could be related to some of his symptoms.  Id.

Dr. Mumm opined that Mr. Freideman's "more generalized pain seems to

stem from a chronic pain syndrome like fibromyalgia."  Id.  Dr. Mumm

suggested that "[c]entrally-acting agents like antidepressants, muscle relaxers,

as well as other agents like gabapentin, Lyrica, tricyclic and antidepressants

maybe [sic] helpful for some of those overall symptoms."  Id.  Dr. Mumm found

no evidence to suggest ankylosing spondylitis.  Id.  Dr. Mumm referred

Mr. Freideman to an orthopedic surgeon for evaluation of the labral tear.  Id.

There are no other medical records in the administrative record from

Dr. Mumm.

From these records, Mr. Freideman argues that Dr. Mumm, an

acceptable medical source, diagnosed "chronic pain, widespread in nature,"

which is a feature of fibromyalgia in SSR 12-2p.II.A.1 and II.B.1. Also,

Dr. Mumm documented three complaints by Mr. Freideman that align with

constitutuional problems in Listing 14.09D, which requires only two such

problems be documented: fevers, 20-pound weight loss, fatigue, and weakness

(the listing lists severe fatigue, fever, malaise, or involuntary weight loss).

As for the discrepancy between step two and step three, Mr. Freideman

argues the ALJ is required to follow the five-step process *in order*. 20 C.F.R.

§ 404.1520(4). If the ALJ fails to correctly follow the sequential order of

evaluation, remand is required. Goff v. Barnhart, 421 F.3d 785, 789-90 (8th

Cir. 2005). Mr. Freideman asks this court to find that he meets the

requirements of Listing 14.09D and, therefore, to award him disability benefits.

Alternatively, Mr. Freideman asks the court to remand to the ALJ to reconsider

his fibromyalgia at steps 3-5.

There is no listing for fibromyalgia. Mr. Freideman focuses on listing

14.09D as the basis for an award of disability benefits at step three. Listing

14.09D requires that Mr. Freideman show (1) inflammatory arthritis as

described in listing 14.00D6 and (2) repeated manifestations of inflammatory

arthritis, with at least *two* constitutional symptoms (severe fatigue, fever,

malaise, or involuntary weight loss), and *one* of the following at the *marked*

30

level:  (a) limitation of activities of daily living, (b) limitations in maintaining social functioning, or (c) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.  See 20 C.F.R. Part 404, Subpart P, Appx. 1, listing 14.09D.

To satisfy the first prong of the test for listing 14.09D, Mr. Freideman must satisfy the listing for inflammatory arthritis found at listing 14.00D6. This listing covers a "vast array of disorders that differ in cause, course, and outcome."  See 20 C.F.R. Part 404, Subpart P, Appx. 1, listing 14.00D6. Subpart 6(e)(ii) of listing 14.00D states that listing-level severity is shown in listing 14.09D "by inflammatory arthritis that involves various combinations of complications of one or more major peripheral joints or other joints, such as inflammation or deformity, extra-articular features, repeated manifestations, and constitutional symptoms or signs.  Extra-articular impairments may also meet listings in other body systems."  Id.  In subpart 6(e)(iii), listing 14.00D6 goes on to state that "extra-articular" inflammatory arthritis features may involve any body system, including musculoskeletal, opthamologic, pulmonary, cardiovascular, renal, hematologic, neurologic, mental, and immune system. Id.

To satisfy the second prong of the test for listing 14.09D, four showings must be made:  (1) repeated manifestations of inflammatory arthritis as described above, (2) & (3) two of the listed symptoms and (4) one of the listed limitations at the "marked" level.  Id.  The evaluation of whether Mr. Freideman meets or equals the listing at 14.09D should be made in the first instance by

31

the ALJ.  The ALJ did not consider listing 14.09D in her analysis and there are many unanswered questions about the applicability of that listing to Mr. Freideman's impairments that should be answered first by the ALJ.

However, fibromyalgia *was* presented by the record, fairly and squarely and the ALJ should have analyzed Mr. Freideman's impairment using SSR 12-2p, the agency's own guidance for evaluating fibromyalgia.  Under SSR 12-2p, fibromyalgia may be analyzed using either of two sets of criteria.  See SSR 12-2p, IIA and B.  One set of criteria is based on the 1990 American College of Rheumatology (ACR) Criteria for Classification of Fibromyalgia.  Id. at IIA.  The other set of criteria is based on the 2010 ACR Preliminary Diagnostic Criteria.  Id. at IIB.

Under the 1990 ACR standard, the Commissioner "may" find that a claimant has a medically determinable impairment (MDI) of fibromyalgia (FM) if the following criteria are met:

> 1.    A history of widespread pain in all quadrants that has persisted for at least 3 months.  The pain may fluctuate in intensity and may not always be present.
>
> 2.    At least 11 of 18 specified tender points on physical examination, both above and below the waist.
>
> 3.    Other disorders that could cause the above symptoms have been excluded or ruled out.

Id. at IIA.

Under the 2010 ACR standard, the Commissioner "may" find that a claimant has a MDI of FM if the following criteria are met:

32

1.    A history of widespread pain in all quadrants that has persisted for at least 3 months.  The pain may fluctuate in intensity and may not always be present (same as (1) above).

2.    Repeated manifestations of six or more FM symptoms, signs, or co-occuring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome.

3.    Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.

Id. at IIB.

Although this court can ascertain that many of the above criteria are present in Mr. Freideman's medical records, even if this court were to find all criteria have been met, the policy guidance says the Commissioner "may" find an MDI of FM if the criteria has been shown.  The policy guidance does not compel a finding of an MDI of FM upon showing the criteria.  The ALJ should apply SSR 12-2p in the first instance, both at step three and (if no listing is found to be met or equaled), at steps four and five as well.  The court accordingly recommends this case be remanded for the ALJ to so consider.

**E.    Weight to Accord to Dr. Christopherson's Opinion**

**1.    Standard for Evaluating A Treating Physician's Opinion**

Mr. Freideman asserts that the ALJ failed to assign proper weight to the opinion from Dr. Lyle Christopherson, a treating psychiatrist, as to Mr. Freideman's mental health and functioning.  Mr. Freideman goes further and suggests the ALJ didn't even read Dr. Christopherson's opinion.

Medical opinions from acceptable medical sources are considered evidence which the ALJ will consider, along with all relevant record evidence, in

33

determining whether a claimant has an impairment, the nature and severity of

the impairment, and the claimant's RFC. <u>See</u> 20 C.F.R. § 404.1527(a)(2). All

medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in
> the record;

> --whether the opinion is internally consistent;

> --whether the person giving the medical opinion examined
> the claimant;

> --whether the person giving the medical opinion treated the
> claimant;

> --the length of the treating relationship;

> --the frequency of examinations performed;

> --whether the opinion is supported by relevant evidence,
> especially medical signs and laboratory findings;

> --the degree to which a nonexamining or nontreating
> physician provides supporting explanations for their
> opinions and the degree to which these opinions consider
> all the pertinent evidence about the claim;

> --whether the opinion is rendered by a specialist about
> medical issues related to his or her area of specialty; and

> --whether any other factors exist to support or contradict the
> opinion.

<u>See</u> 20 C.F.R. § 404.1527(a)-(f); <u>Wagner v. Astrue</u>, 499 F.3d 842, 848 (8th Cir.

2007).

The Commissioner will give controlling weight to the opinion of a treating

source as to the nature and severity of a claimant's impairment if (1) the

opinion is well-supported by medically acceptable clinical and laboratory

diagnostic techniques, and (2) the opinion is not inconsistent with the other

substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2); Nowling, 813 F.3d at 1122.  "A treating physician's opinion, however, 'does not automatically control or obviate the need to evaluate the record as a whole.' "  Nowling, 813 F.3d at 1122-23 (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)).  If the opinion of the treating physician is inconsistent, or if other medical evaluations are "supported by better or more thorough medical evidence" the ALJ may be entitled to discount or even disregard a treating physician's opinion.  Nowling, 813 F.3d at 1123; House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007); Wagner v. Astrue, 499 F.3d 842, 853-854 (8th Cir. 2007); Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).  "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant."  Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict.  Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion.  Wagner, 499 F.3d at 849; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)).

However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's RFC determination, such a conclusion may be supported by substantial evidence.  Harvey, 368 F.3d at 1016.  Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation.  Flynn v. Astrue, 513 F.3d 788, 793 (8th Cir. 2008)(citing Casey v. Astrue, 503 F.3d 687, 691-692 (8th Cir. 2007)).

Certain ultimate issues are reserved for the Commisioner's determination.  20 C.F.R. § 416.927(e).  Any medical opinion on one of these ultimate issues is entitled to no deference because it "invades the province of the Commissioner to make the ultimate disability determination."  House, 500 F.3d at 745 (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)).  See 20 C.F.R. § 416.927(e)(3).  The ultimate issues reserved to the Agency are as follows:

1.    whether the claimant is disabled;

2.    whether the claimant is able to be gainfully employed;

3.    whether the claimant meets or exceeds any impairment in the Listing of Impairments (appendix 1 to subpart P of part 404 of 20 C.F.R.);

4.    what the claimant's RFC is; and

5.    what the application of vocational factors should be.

See 20 C.F.R. § 416.927(e)(1) and (2); see also Wagner, 499 F.3d at 849 (the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment.") (quoting

36

Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)).  The RFC determination is specifically noted to be one of those determinations that is an ultimate issue for the Agency to determine.  20 C.F.R. § 416.927(e)(2); Cox, 495 F.3d at 619-620. In evaluating a treating physician's opinion, the ALJ must "always give good reasons" supporting her decision regarding the weight afforded that opinion. Nowling, 813 F.3d at 1123; Reed, 399 F.3d at 921; 20 C.F.R. § 404.1527.

In the Nowling case, Nowling's treating physician described her in a medical source statement as seriously limited or unable to meet competitive standards such as the ability to maintain regular attendance at work and be punctual, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to respond appropriately to changes in work routine, and to deal with stress of semiskilled and skilled work.  Nowling, 813 F.3d at 1117.  The ALJ discounted this treating physician's opinion of Nowling's functional abilities, claiming it was inconsistent with other (nontreating) experts' opinions and with the treating physician's own records. Id. at 1123.  In support of his opinion, the ALJ highlighted one entry in the treating physician's notes showing Nowling had a GAF of 56 and had demonstrated "improvement."[24]  Id.

---

[24] GAF stands for Global Assessment of Functioning.  GAF uses a scale from 0 to 100 to indicate social, occupational and psychological functioning with a 100 being the most healthy mentally.  A GAF of 41 to 50 indicates serious symptoms/impairment in social, occupational, or school functioning while a GAF of 51 to 60 indicates moderate symptoms or difficulty.  Nowling, 813 F.3d at 1115 n.3. Both the Eighth Circuit and the Commissioner have recognized that GAF scores have limited importance.  Id.

The court held the GAF score was "of little value" and, in any event, Nowling had consistently had GAF scores of 45 to 50 over the course of two years and 38 therapy sessions. Id. at 1115-16. The one-time GAF score of 56 was an anomaly. Id. Furthermore, in highlighting the fact that Nowling exhibited improvement on one occasion, the ALJ failed to recognize that Nowling's mental impairments waxed and waned over a substantial treatment period, that her symptoms were unpredictable and sporadic, and that her structured living environment had an effect on the manifestation of her symptoms. Id. Here, the court held, the ALJ failed to give good reasons for discounting the treating physician's opinion because the ALJ failed to acknowledge the nature of the mental disorder at issue and the longitudinal treatment record. Id. The court remanded to the agency. Id.

In the House case, the ALJ's decision disregarding the treating physician's opinion was affirmed, in large part because there were "profound" inconsistencies between the treating physician's opinion on the one hand, and the medical evidence and the claimant's own testimony on the other. House, 500 F.3d at 744-745. The ALJ had determined that the claimant suffered from a severe impairment that left him unable to perform his past relevant work, but that he retained the RFC to perform certain unskilled sedentary jobs. Id. at 742. The key issue as to the claimant's ability to perform unskilled sedentary work turned on whether he could sit for prolonged periods of time. Id. at 743-745.

The medical records established restrictions on the claimant's ability to stand and walk, but not on his ability to sit.  Id.  The claimant's own statements in questionnaires and testimony at the hearing also indicated that his impairment affected his ability to stand and walk, but not to sit.  Id.  The treating physician's opinion that there were significant limitations on the claimant's ability to sit came only in response to a letter from the claimant's lawyer and only after the case had been remanded from the Appeals Council back to the ALJ for additional findings.  Id. at 743.  Under these facts, the ALJ was justified in finding that the treating physician's statement was inconsistent with the medical evidence on the whole.  Id. at 743-745.

In Dolph v. Barnhart, 308 F.3d 876, 876 (8th Cir. 2002), the claimant alleged disability from a combination of kidney disease which caused hypertension, degenerative disease of the cervical spine, and carpal tunnel syndrome.   The ALJ denied benefits, finding that the claimant retained the RFC to perform past relevant work.  Id. at 878.  In reaching this conclusion, the ALJ disregarded a portion of the RFC assessment completed by the claimant's kidney doctor.  Id. at 878-879.  This was assigned as error by the claimant on appeal.  Id.

The Eighth Circuit affirmed, noting that the ALJ fully credited the treating physician's opinion about the claimant's kidney disease because this was within the treating physician's area of specialty.  Id. at 879. However, the ALJ gave less weight to the kidney doctor's RFC assessment of the claimant's cervical spine degeneration and carpal tunnel.  Id.  The kidney doctor had not

39

treated the claimant for these neck and arm conditions and had not made any clinical findings concerning these conditions.  Id.  The Eighth Circuit found that the ALJ's analysis of the kidney doctor's RFC assessment was consistent with the regulations governing how medical opinions are to be weighed and evaluated.  Id.  See also Reed, 399 F.3d at 922 (noting that less weight may be accorded to a treating physician's opinion where that opinion concerns a condition outside the physician's specialty, for which he did not treat the claimant and as to which he had not made any clinical findings).

In Wagner, the Eighth Circuit affirmed the ALJ's decision to discount a particular medical opinion of the claimant's treating physician where that particular opinion was inconsistent with two other opinions he gave about the claimant on the same subject on two other occasions, one predating the opinion that was discounted, and one postdating that opinion.  Wagner, 499 F.3d at 849-850.

In evaluating a medical source opinion, the ALJ was required to consider whether the medical source had treated the claimant, how long the treatment relationship had lasted, and whether the medical source had examined the claimant.  20 C.F.R. § 404.1527.

## 2.    Dr. Christopherson's Opinion & the ALJ's Treatment of It

The Commissioner sent Dr. Christopherson a "checkbox" form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." AR726-28.  The Commissioner asked Dr. Christopherson to fill out the form to "assist us in determining this individual's ability to do work-related activities

40

on a sustained basis." AR726.  Dr. Christopherson filled out the form as

requested on October 5, 2015.  AR726-28.  The form asked Dr. Christopherson

to rate Mr. Freideman's ability to perform various activities using a scale of

"none," "mild," "moderate," "marked," and "extreme."  "Moderate" was defined

by the Commissioner on the form as "there is more than a slight limitation in

this area, but the individual is still able to function satisfactorily."  AR726.

"Marked" was defined as "there is a serious limitation in this area.  This is

substantial loss in the ability to effectively function."  Id.

Using the Commissioner's definitions, Dr. Christopherson opined that

Mr. Freideman experienced moderate limitations in the following activities:

--Understand and remember simple instructions

--Carry out simple instructions

--The ability to make judgments on simple work-related decisions

--Interact appropriately with the public.

AR726-27.  Thus, Dr. Christopherson opined Mr. Freideman had more than

slight limitations in the above areas, but could still function satisfactorily.

Again using the Commissioner's definitions, Dr. Christopherson opined

that Mr. Freideman experienced marked limitations in the following areas:

--Understand and remember complex instructions

--Carry out complex instructions

--The ability to make judgments on complex work-related decisions

--Interact appropriately with supervisor(s)

41

--Respond appropriately to usual work situations and to changes in a

      routine work setting.

AR726-27.  Thus, Dr. Christopherson opined Mr. Freideman had serious

limitations in these areas and had a substantial loss in the ability to effectively

function.

      The Commissioner's form did have limited room for narrative answers.

AR727.  When asked to identify the medical signs, laboratory findings or other

factors that supported his assessment, Dr. Christopherson wrote:  "Recently

since I've been seeing Todd again he has struggled with even simple things in

life.  He was 'let go' by an employer for not being able to do work he would have

handled in the past.  Lots of negativity, rumination."  Id.

      When asked to identify other capabilities affected by the impairment,

Dr. Christopherson wrote:  "He has some new medical issues with chronic

pain.  He is 'absolute' in his thinking.  Very rigid.  Overthinks everything and

anything."  Id.

      When asked to identify the medical signs, laboratory findings, or other

factors supporting this assessment, Dr. Christopherson wrote:  "Even when

medicated correctly he remains depressed."  Id.

      When asked to give an opinion within a reasonable degree of medical

certainty about when in the past Mr. Freideman's limitations first rose to their

current level, Dr. Christopherson wrote:  "He has been depressed but

functional until about 1 year [ago]."  Id.  The Commissioner's form inquired

about alcohol or substance abuse, but Dr. Christopherson wrote

Mr. Freideman had been clean and sober for a number of years.  Id.

Nowhere on the form the Commissioner sent to Dr. Christopherson did it ask for his opinion on Mr. Freideman's ability to maintain persistence, pace, concentration, or social functioning.  See AR726-28.  Nowhere on the form the Commissioner sent to Dr. Christopherson did it ask whether Mr. Freideman could handle his own finances.  Id.

Regarding Dr. Christopherson's opinion found at AR726-28, the ALJ wrote in her opinion she was giving it "some weight," but seemingly discounted the opinion because "it is . . . seen only as based on a recent exacerbation of his symptoms and with the claimant's input."  AR27.  The ALJ went on, supposedly recounting Dr. Christopherson's opinion, stating the doctor found Mr. Freideman "had moderate to marked difficulties in social functioning and concentration, persistence and pace."  Id.  As noted above, the opinion form at AR726-28 never asked for, nor did Dr. Christopherson volunteer, an opinion on these subjects.  Compare AR 27 with AR726-28.  It appears the ALJ either made this passage up out of thin air or confused Dr. Christopherson's opinion with that from another medical source.

Furthermore, again supposedly recounting the doctor's opinion, the ALJ stated Dr. Christopherson opined Mr. Freideman "could handle his own finances."  AR27.  As noted above, the opinion form at AR726-28 never asked for, nor did Dr. Christopherson volunteer, an opinion on the subject of

43

Mr. Freideman's ability to handle his finances.  <u>Compare</u> AR27 <u>with</u> AR726-28. This court cannot guess where the ALJ plucked this supposed opinion from.

The ALJ did accurately recount some of Dr. Christopherson's narrative answers.  AR27 (reciting " 'absolute' in his thinking, very ridged, and over-thinks everything and anything. . . depressed but functional until about one year ago.").  Significantly, the ALJ left out Dr. Christopherson's narrative response that Mr. Freideman remained depressed even when he was medicated correctly.  <u>Compare</u> AR27 <u>with</u> AR727.

From these discrepancies, Mr. Freideman argues the ALJ did not even read Dr. Christopherson's opinion.  Furthermore, Mr. Freideman asserts the ALJ discounted Dr. Christopherson's opinion because it was based on a "recent exacerbation," but never identified what that recent exacerbation was. Mr. Freideman also engages in a lengthy evaluation of Dr. Christopherson's opnion as evaluated against his own longitudinal records and against the records of other providers who had substantial experience with Mr. Freideman's mental status.  <u>See</u> Claimant's Brief at Docket No. 15, pp. 27-30.  Based on this independent evaluation, Mr. Freideman seeks a determination from this court that the ALJ should have credited Dr. Cristopherson's opinion and that an award of benefits is warranted.

The Commissioner argues the ALJ did read Dr. Christopherson's opinion, but she "interpreted" that opinion in light of the Paragraph B criteria found at 20 C.F.R. Part 404, Subpart P, App. 1, Listing 12C(1), (2), and (3).  The

Paragraph B criteria reference social functioning, concentration, persistence and pace.

As with the earlier argument posited by the Commissioner concerning "scrivner's error," this court simply does not buy the argument that the ALJ "interpreted" Dr. Christopherson's opinion in light of the Paragraph B criteria. Perhaps Dr. Christopherson's opinons about how Mr. Freideman could be expected to get along with his boss and the public could be conflated to be an evaluation of "social functioning." Perhaps the ability to follow instructions can be conflated to be an evaluation of "concentration." However, there is simply no opinion expressed by Dr. Christopherson that can be analogized to "persistence and pace." He did not evaluate these factors and the court is at a loss to understand where the ALJ pulled those references from when writing her opinion.[25]

In addition, the Paragraph B criteria urged by the Commissioner concern the question whether a claimant meets a listing at step three of the sequential evaluation. Simply because a claimant does not meet or equal a listing-level

---

[25] The checkbox form filled out by Dr. Christopherson seems to parallel the factors discussed in SSR 85-15 discussing evaluation of, *inter alia*, nonexertional mental impairments. In that policy guide, the Commissioner stated that if a person had a mental impairment that was not of lisiting severity, but does prevent the person from performing past relevant work, then the final consideration was whether the person could perform "unskilled work." SSR 85-15 at 1. "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Id. "A substantial loss of ability to meet *any* of these basic work-related activities would severely limit the potential occupational base." Id. (emphasis added).

mental impairment at step three does not mean the claimant is not disabled. Rather, despite a finding of "not disabled" at step three, a claimant with a mental impairment can still be disabled at step five if he is unable to perform even unskilled work. See SSR 85-15 1(Mental Impairments). Thus, it appears the ALJ was evaluating the listing criteria, whereas Dr. Christopherson's opinion went directly to the issue whether Mr. Freideman was able to do unskilled work at step five. Compare AR27 (discussing listing-level factors) with SSR 85-15 and AR726-28 (discussing unskilled work factors).

But more importantly than these discrepancies that raise the question whether the ALJ was reading the right opinion, the ALJ simply did not adequately explain why she was not giving Dr. Christopherson's opinion controlling weight. The ALJ did not note that Dr. Christopherson was a treating medical source. AR27. He was. Dr. Christopherson treated Mr. Freideman for a long period of time up to 2010, and then resumed treating him again March 11, 2013. AR 392-93. From March, 2013, to the date of the ALJ hearing Dr. Christopherson saw Mr. Freideman eight times. AR392-92, AR 499-501, 506-08, 511-12, 543-45, 562-64, 714-15, and 723-25.

The ALJ did not compare Dr. Christopherson's opinion with the longitudinal evidence from his own records, or from those of other treating sources, and find discrepancies. AR27 Dr. Christopherson's records were congruent with his opinion.

He described Mr. Freideman on July 28, 2014, as being "a little bit of an odd duck," "isolative," complaining of memory problems and chronic pain,

"circumstantial," and running things over and over again.  AR500.

Dr. Christopherson said Mr. Freideman had always been that way, but he was

worse now.  Id.  Mr. Freideman was now depressed, whereas previously when

Dr. Christopherson treated him he was not depressed.  Id.  The doctor

described Mr. Freideman as "certainly . . . struggling right now" and having "a

fair amount of anxiety."  Id.  Dr. Christohperson prescribed Klonopin.  Id.

Dr. Christopherson diagnosed Mr. Freideman with major depression with a

history of psychotic features, anti-social personality traits, and schizoid or

Cluster A traits.  AR501.

One month later, Mr. Freideman saw Dr. Christopherson again and was

doing better.  AR507.  However, Dr. Christopherson increased Mr. Freideman's

Klonopin prescription at this time.  Id.  In September, 2014,

Dr. Christopherson noted Mr. Freideman was doing "pretty well" and continued

his medications with no change.  AR512.

In June, 2015, Dr. Christopherson noted Mr. Freideman "really isn't

doing well."  AR544.  He had essentially been fired by his dry wall boss because

he was not getting along with customers and co-workers and could not do the

job.  Id.  Mr. Freideman showed Dr. Christopherson the text he had received

from his boss.  Id.  Mr. Freideman related he thought he received a cognitive

impairment when his dad tried to kill him through carbon monoxide poisoning

when he was three years old.  Id.  Dr. Christopherson noted that this story had

been independently corroborated by Mr. Freideman's brother.  Id.

Mr. Freideman described himself as "very depressed" and reported the

47

Klonopin was no longer working to help him sleep.  Id.  Dr. Christopherson

doubled Mr. Freideman's Cymbalta prescription, discontinued the Klonopin,

and started a new prescription for Belsomra for sleep.  Id.  Mr. Freideman

expressed a desire for a Restoril prescription, but it was not covered by

indigent services and Mr. Freideman was otherwise unable to pay for it himself.

Id.

In August, 2015, Dr. Christopherson again saw Mr. Freideman.

AR562-63.  Mr. Freideman's case manager, Lynn Peskey, recommended

Mr. Freideman consider taking an anti-psychotic medication.  Id.

Dr. Christopherson agreed and prescribed Latuda.  Id.  Dr. Christopherson

described Mr. Freideman's thinking as "real odd" and "a lot of absolute

thinking."  Id.  He opined there was some underlying psychosis.  Id.

Dr. Christopherson saw Mr. Freideman again on September 1, 2015.

AR714.  Dr. Christopherson noted he had "an underlying bizarre kind of

thought disorder where he just gets stuck on negativity.  Anti-psychotics have

traditionally helped him but I think he is still only marginally functional."  Id.

Dr. Christopherson noted he was "truly struggling emotionally."  Id.

The final visit with Dr. Christopherson in the record was September 29,

2015.  AR724.  Dr. Christopherson noted "some" improvement with the anti-

psychotic Latuda, but that Mr. Freideman was still struggling.  Id.  His

medications at this time were Ambien, Cymbalta, and Latuda.  Id.

Mr. Freideman reported the Ambien was not helping him sleep, but that he had

tried a number of other sleep medications and they either did not work or he

48

did not tolerate them.  Id.  Dr. Christopherson's medical source statement, which the ALJ discounted, was filled out just six days later.  AR726-28.

The ALJ did not explain what the "recent exacerbation" was which she believed Dr. Christopherson erroneously relied upon in coming to his conclusions.  AR27.  Dr. Christopherson saw Mr. Freideman seven times from July, 2014, to September 29, 2015, and he never showed marked or permanent improvement but was described as "struggling" during the entire time.  If this was a "recent exacerbation," it lasted for well over a year and there was no indication the exacerbation ever receded permanently.

The ALJ did not explain why or if Dr. Christopherson's clinical and laboratory diagnostic techniques were lacking.  AR27.  In short, the ALJ failed to give the "good reasons" she was required to give in support of her decision not to give controlling weight to Dr. Christopherson's opinion.  20 C.F.R. § 404.1527; Nowling, 813 F.3d at 1123; Reed, 399 F.3d at 921.

This court will not, as Mr. Freideman did in his brief, attempt to weigh Dr. Christopherson's opinion against the bulk of the medical evidence in the record and come to an independent conclusion whether the opinion was entitled to controlling weight or not.  This is a job the ALJ should have tackled first.  Having failed to do so, and this court having serious concerns whether the ALJ even read Dr. Christopherson's medical source opinion, the proper remedy is to remand the matter back to the ALJ to reevaluate Dr. Christopherson's opinion.  She should do so in light of all the required factors.  See 20 C.F.R. § 404.1527(c)(1) – (6); Wagner, 499 F.3d at 848.

**F.    Psychiatric Review Technique Form**

Mr. Freideman argues that the ALJ erred when she performed the psychiatric review technique form (PRTF) herself in her written opinion (AR20-21) without assistance from a mental health professional.  The Commissioner responds that the regulations, 20 C.F.R. § 404.1520a(e)(4), allow the ALJ to perform the PRTF herself, so there was no error.

Congress has provided by statute that when making a disability determination in a case where there is evidence indicating the existence of a mental impairment, the Commissioner must make "every reasonable effort to ensure . . . that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment."  42 U.S.C. § 421(h)(1).  Section 404.1520a(a) of Title 20 of the Code of Federal Regulations states in relevant part, "when we evaluate the severity of mental impairments . . . we *must* follow a special technique at each level in the administrative review process.  We describe the technique in paragraphs (b)( through (e) of this section."  See 20 C.F.R. § 404.1520a(a).  The document described in § 404.1520a is the PRTF.  Completing a PRTF is mandatory in any case in which a mental impairment is present.  Cuthrell v. Astrue, 702 F.3d 1114, 1117 (8th Cir. 2013).

The Eighth Circuit has suggested, but not held, that failure to complete a PRTF is reversible error, the court has "left the door open to harmless-error analysis."  Id. at 1118.  Thus, the court has found failure to complete a PRTF to be harmless error where there was no credible evidence of a severe mental

impairment. Id. (citing Nielson v. Barnhart, 88 Fed. Appx. 145, 147 (8th Cir. 2004) (*per curiam*); Cakora v. Barnhart, 67 Fed. Appx. 983, 985 (8th Cir. 2003) (*per curiam*); Fountain v. R.R. Retirement Bd., 88 F.3d 528, 532 (8th Cir. 1996).

In Montgomery v. Shalala, 30 F.3d 98, 99 (8th Cir. 1994), the claimant (unlike Mr. Freideman in this case), alleged a mental impairment initially in his application. A PRTF was completed by a state agency medical consultant at the initial and reconsideration levels. Id. At the hearing level before the ALJ, however, no PRTF was completed. Id. at 99-100. This was urged as reversible error before the district court. Id. The district court, acknowledging precedent which suggested the ALJ's failure to complete a PRTF at the hearing level was grounds for reversal, nevertheless found the error to be harmless because the ALJ included the claimant's mental impairments in the hypothetical given to the vocational expert. Id. at 100. The Eighth Circuit reversed and remanded. Id.

The court noted that the claimant's mental impairment included a condition that affected his perception of pain arising from bona fide physical conditions and which affected his social and occupational impairment far in excess of what physical findings would suggest. Id. Here, the ALJ's description of the claimant's mental condition in the hypothetical that the claimant suffered from "some depression" for which he had received treatment inadequately conveyed the nature and extent of the mental impairment. Id. Providing guidance on remand, the court noted that the ALJ was authorized under the regulations to complete the PRTF himself, but was also bound to

make "every reasonable effort" to obtain an opinion from a qualified psychiatrist or psychologist as to the medical portion of the case and the claimant's mental RFC.  Id. at 101.

In the Cuthrell case, the ALJ had found Cuthrell had a severe impairment of a closed-head injury, with symptoms that [were] mental in nature.  Cuthrell, 702 F.3d at 1117.  No PRTF had been performed.  Id. at 1116.  Because of the finding of a severe mental impairment, the court held it was not harmless error for the ALJ to have failed to complete a PRTF.  Id. at 1118.

Similarly, in a case decided in this district, where there had been no PRTF completed prior to the hearing before the ALJ, the court reversed because there was no evidence the ALJ made "every reasonable effort" to obtain an assessment through a PRTF from a qualified psychologist or psychiatrist.  See Houseweart v. Astrue, 2011 WL 1256829 at **24-25 (D.S.D. Mar. 7, 2011).

In Mr. Freideman's case, the ALJ found he had severe mental impairments of anti-social personality trait and major depressive disorder.  AR20.  No PRTF was performed prior to the hearing before the ALJ.  The ALJ performed the PRTF herself, for the first time, in the written decision, but it does not seem to incorporate any medical evidence—it is based solely on Mr. Freideman's own assessment of his abilities and his daily activities.  AR20-

21.  The PRTF is therefore a layperson's (the ALJ's) nonexpert opinion based on another layperson's (Mr. Freideman's) nonexpert opinion.[26]

The pitfalls of relying on a claimant's own assessment of the impact of his mental impairments are illustrated by the case of Parsons v. Heckler, 739 F.2d 1334 (8th cir. 1984).  In Parsons, the claimant had severe mental impairments.  Id. at 1336-39.  The ALJ found the claimant not disabled at step five, finding he could no longer perform past relevant work, but could perform other jobs in the national economy.  Id. at 1339-40.  The claimant lacked insight into the severity of his mental impairment, consistently overpresenting his ability to function.  Id. at 1340.  For example, in a year when he earned $30, he reported earning $2,000.  Id.  When he was employed as a janitor, he reported he was employed as a manager.  Id.  He presented himself as possessing strong employment potential, but was fired from his last job—after which he earned less than $300 over a two-year period.  Id.  At step five, when considering whether there were other jobs in the national economy the claimant could do, the court stated the ALJ "must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes."  Id. at 1341.

---

[26] Even in relying on Mr. Freideman's own assessment of his mental abilities, the ALJ was quite selective in reporting that assessment.  For example, in her opinion, the ALJ while completing the PRTF stated Mr. Freideman could pay attention for an hour, finish what he starts, and likes to watch television. AR21.  What she left out was that Mr. Freideman said he can only sit for a few minutes at a time (5-15 minutes), before his tailbone becomes too painful and he often has to rewind entire movies and watch them again because he cannot remember what happened.  AR319, 321.

So, too, here.  Although Mr. Freideman has a substantial history of receiving mental health care,[27] taking serious mental-health medications,[28] and had a therapy dog for 10 years,[29] he did not list any mental impairments on his application for disability (AR228-30), believing they were not "that bad."  AR74. He preferred instead to focus on his physical impairments.  AR228-30.  He claimed he had never been fired from a job or gotten in any trouble for failing to get along with people, though his medical records showed otherwise.  Compare AR312 with AR544 (fired for failing to get along); and AR730 (multiple arrests). He failed to acknowledge any mental impairment pre-hearing, but stated someone else handled his checking account and paid his bills.  AR309.  He stated he handled stress "pretty good," (AR312), but during one therapy session could not quit stressing out about the fact his eyes had been dialated in an eye exam.  AR714.

The ALJ found Mr. Freideman had severe mental impairments, but she did not fulfill her duty to make "every reasonable effort" to obtain an assessment of Mr. Freideman's mental impairments from a qualified psychologist or psychiatrist.  Houseweart, 2011 WL 1256829 at **24-25.  The court acknowledges that the ALJ has latitude under the regulation to complete the PRTF herself.  See 20 C.F.R. § 404.1520a(e)(4).  In this court's opinion, that

---

[27] See page 5, and footnotes 4 & 5, supra; and pages 13-15, and footnotes 13-16, supra.

[28] See, e.g. AR562-62 (Latuda); AR501 (Klonopin); AR544 (Belsomra); AR544 (Cymbalta).

[29] See AR312.

option does not *in this case* fulfull the ALJ's duty under 42 U.S.C. § 421(h) to use every reasonable effort to obtain the opinion of mental health professionals. That is because here: (1) there was no PRTF completed at the intial or reconsideration stages (i.e. no state agency assessment of Mr. Freideman's mental RFC); (2) the ALJ's PRTF is not based on any medical evidence but solely on Mr. Freideman's self-reported abilities and activities of daily living which are often not congruent with reality; and (3) as discussed further below, the ALJ disregarded to a great degree the opinion from every mental health professional who treated Mr. Freideman.  See Pratt v. Sullivan, 956 F.2d 830, 834 (8th Cir. 1992) (reversing where ALJ substituted his own unsubstantialed conclusion concerning metnal impairments in place of the express diagnoses of claimant's examining psychiatrists and psychologists).  Accordingly, remand is warranted as to this issue.

**G.    Development of the Record—Dr. Gennea Danks' Report**

Gennea Danks, Ph.D., licensed psychologist, provided a medical source statement dated September 28, 2015, that appears in the agency record. AR729-31.  Dr. Danks evaluated Mr. Freideman as being markedly limited in his ability to undersand and remember simple instructions, to make judgments on simple work-related decisions, to interact appropriately with supervisors and coworkers.  AR729-30.  Dr. Danks evaluated Mr. Freideman as being extremely limited in his ability to understand and remember complex instructions, to carry out complex instructions, to make judgments on complex

work-related decisions, and to respond appropriately to usual work situations and to changes in a routine.  Id.

In her narrative answers on the SSA form, Dr. Danks wrote that Mr. Freideman has had multiple head injuries, repeated loss of consciousness, was born three months premature, was in an incubator for six months, was accidentally electrocuted on more than one occasion, has negatively affected memory, has been arrested multiple times, has both cognitive and physical limitations, suffered chronic physical abuse including head injury and attempted asphyxiation.  Id.   The ALJ accorded Dr. Danks' opinion "little weight," asserting that Dr. Danks had seen Mr. Freideman only on one occasion.  AR28.

In addition to  Dr. Danks' medical source statement, there was one other record from her that was before the agency.  See AR547-48.  This record showed that Dr. Christopherson had referred Mr. Freideman to Dr. Danks for cognitive testing.  Id.  Dr. Danks saw Mr. Freideman in June, 2015, and discussed the possibility of cognitive testing, including that the Commissioner may not accept the testing if the Commissioner did not specifically request it and, if Dr. Danks did perform the test uninvited, she would not be able to perform another cognitive test on Mr. Freideman for at least a couple of years. Id.  Therefore, the cognitive testing was deferred.  Id.  However, Dr. Danks wrote in her record that she completed "a very thorough clinical interview" of Mr. Freideman so that if the Commissioner did refer him for cognitive testing,

the clinical interview portion of the testing would already be completed and ready to go.  Id.

Before this court, Mr. Freideman argues that the ALJ erred by not developing the record and requesting a copy of Dr. Danks' "very thorough clinical interview" of Mr. Freideman which was mentioned in AR547-48. Mr. Freideman asserts the June, 2015, record from Dr. Danks in the record clearly pointed to the existence of the clinical interview, which was missing from the record.  The report of the clinical interview Dr. Danks conducted with Mr. Freideman is presented to this court merely to show that the ALJ's failure to obtain the record was not harmless error.  See Docket No. 15-1.

The Commissioner argues the report was created approximately five months before the ALJ  hearing.  Two months prior to the hearing, the ALJ sent Mr. Freideman a letter instructing him to bring all his evidence to the hearing such as recent records, report or evaluations.  The Commissioner argues Dr. Danks' medical source opinion did not make reference to any other records, so the ALJ was not on notice that the other records existed.  The Commissioner points out that Mr. Freideman's attorney did not submit the record at the heaing, nor did he submit it to the Appeals Council when requesting review before that body.  Finally, the Commissioner argues that Mr. Freideman makes no showing that this is new and material evidence.

Taking the last argument first, the issue is *not* whether the Danks record is new and material.  It is not offered for that purpose.  Rather, it is offered to show that the ALJ's failure to develop the record was harmful, not harmless.

And there *was* evidence in the record that should have alerted the ALJ to the existence of the record.  Dr. Danks stated that she had performed a two-hour comprehensive clinical interview.  AR547-48.  It is *that* interview which was missing from the record.  The ALJ should have known that a two-hour interview would have been documented and reduced to written form.

The fact that Mr. Freideman was represented (by other counsel) at the hearing before the ALJ does not obviate the ALJ's duty to develop the record. The duty of the ALJ to develop the record—with or without counsel representing the claimant--is a widely recognized rule of long standing in social security cases:

> Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of the case. However, social security hearings are non-adversarial.  Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.  The ALJ's duty to develop the record extends even to cases like Snead's, where an attorney represented the claimant at the administrative hearing.  The ALJ possesses no interest in denying benefits and must act neutrally in developing the record.

Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004) (citations omitted).  See also Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010) (ALJ has a duty to develop the record even when claimant has counsel).  Nor can it be said the ALJ had no reason to know of the missing record—AR547-48 clearly pointed to the existence of the missing interview documentation.

Although the ALJ's duty to develop the record is limited by the adjective "reasonable," the ALJ in this case should have requested Dr. Danks' June 16, 2015, documentation of her clinical interview with Mr. Freideman.  This error

in not developing the record in this manner was unreasonable because it was compounded in this case by several factors. One of the reasons the ALJ gave "little weight" to Dr. Danks' medical source opinion was that the ALJ said Dr. Danks had only seen Mr. Freideman once. AR28. That assessment by the ALJ would have been impacted had the ALJ known that Dr. Danks spent a considerable amount of time with Mr. Freideman on that one occasion conducting a clinical interview. Furthermore, in the absence of any PRTF from a psychologist or psychiatrist, as discussed above, Dr. Danks' observations as recorded in the missing record take on magnified importance.

For example, Dr. Danks recorded the following diagnostic impressions of Mr. Freideman: schizoaffective disorder, depressive type; major depressive order, recurrent, severe w/psychotic features, chronic. See Docket No. 15-1. Dr. Danks' interview documents a number of head injuries including several where Mr. Freideman lost consciousness and had to go to the emergency room and one that knocked out his front teeth and left him unconscious for two hours. Id. The interview documented physical abuse by his father, including an attempt to kill him by asphyxiation. Id. The interview documented at least three occasions where Mr. Freideman was accidentally electrocuted, including once when he was thrown across a room into a wall and another in which he received burn marks. Id. Cognitively, Mr. Freideman reported he was "always slow" and had a severe stuttering problem. Id. He reported extensive sleep problems and that he "always" has had short-term memory problems. Id. Objectively, Dr. Danks noted that Mr. Freideman cocked his head and stared at

her during the interview and his voice was unusually loud.  Id.  Of course, these professional assessments of Mr. Freideman stand in stark contrast to his own version of how he presents to the world as discussed above.

This court has already recommended this case be remanded for the ALJ to consider other issues, as discussed above.  The court also recommends remanding so the ALJ can request Dr. Danks' record of her June 16, 2015, clinical interview with Mr. Freideman and consider that document, along with the rest of the record evidence, in reevaluating Mr. Freideman's entitlement to benefits.[30]

**H.    ALJ's Formulation of Mr. Freideman's Mental RFC**

**1.    The Law Applicable to Determination of RFC**

Mr. Freideman's final argument is the ALJ erred in determining his mental RFC.  Mr. Freideman argues the ALJ rejected every examining medical source's opinion as to his mental RFC.  Instead, the ALJ relied on her own unqualified opinion.  At step five, he asserts, a nonexamining source's opinion (here, the ALJ's own opinion) cannot support RFC.  Instead, he posits, there must be medical evidence to support it.  Casey v. Astrue, 503 F.3d 687 (8th

---

[30] The court suggests that the ALJ also consider developing the record by obtaining cognitive testing of Mr. Freideman on remand.  There are numerous indications this may be a mental impairment that was not brought to the ALJ's attention.  See e.g. AR371 (claimant lacked ability to concentrate and pay attention in school, a problem he still has today); AR309 (someone else handles claimant's finances); AR311 (claimant often forgets what people say to him); AR315 (claimant is slow to answer questions posed by others); AR494 (claimant slow in his responses to questions); AR 545, 548 (claimant had a corroborated history of carbon monoxide poisoning); and AR729 (claimant has had multiple head injuries).

Cir. 2007); Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (*per curiam*);

Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  Mr. Freideman asserts the

VE's opinion could not constitute substantial evidence to support his mental

RFC because that opinion was not based on medical evidence of his

deficiencies.  Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007).

Residual functional capacity is "defined as what the claimant can still do

despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d

700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC

assessment is an indication of what the claimant can do on a 'regular and

continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)."

Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The

formulation of the RFC has been described as "probably the most important

issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147

(8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222

F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's

mental and physical impairments in combination, including those impairments

that are severe and those that are nonsevere.  Lauer, 245 F.3d at 703; Social

Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the

ALJ "bears the primary responsibility for assessing a claimant's residual

functional capacity based on *all* the relevant evidence . . . a claimant's residual

functional capacity is a medical question."[31] <u>Lauer</u>, 245 F.3d at 703 (citations omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  <u>Id.</u> (citations omitted).

"The RFC assessment must always consider and address medical source opinions."  SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted."  <u>Id.</u>  "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight.  If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight."  <u>Id.</u>

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ.  <u>Id.</u> at n.8.  Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations.  <u>Id.</u>

---

[31] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  <u>See</u> SSR 96-8p.

However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source.  Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."  SSR 96-8p.  However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC."  Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . .  In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

### 2.    Application of the Law to the ALJ's Opinion

In arriving at Mr. Freideman's RFC, the ALJ relied heavily on his own statement of his well-being and abilities and ignored several key pieces of medical evidence.  For example, the ALJ reported Mr. Freideman stated he was taking Klonopin, and it proved helpful.  AR26.  The ALJ noted he "does report issues with some anxiety, but overall seems to be managed sufficiently with medication."  Id.   Meanwhile, Dr. Christopherson's medical source statement that Mr. Freideman remains depressed even when appropriately medicated is not mentioned by the ALJ.  Compare AR26-27 with AR727.  The ALJ also fails to acknowledge Dr. Christopherson's notation that anti-pscyhotic medications had helped Mr. Freideman in the past, but now rendered him only "marginally functional."  Compare AR27 with AR714.  Nor does the ALJ mention that, although Klonopin worked well initially (AR500), it had to be first increased (AR507), then discontinued altogether (AR544) because it was no longer helping.  The ALJ's discrediting of Dr. Christopherson's opinion is discussed at greater length above.

The ALJ gave "limited weight" to the opinion of Mr. Freideman's case manager, Gertrude Larsen, MA.  AR27.  This was both because Ms. Larsen was a non-acceptable medical source and also because Ms. Larsen's opinion that Mr. Freideman's limitations were extreme in some areas was inconsistent with her own treatment notes and with Dr. Christopherson's opinion.  Id.  The ALJ does not point out what portion of Ms. Larsen's treatment notes are inconsistent with her opinon of extreme limitations.  Id.  And, though the ALJ

states that Ms. Larsen's opinion conflicts with Dr. Christopherson's, the ALJ

never says *how* they conflict.  Id.  Because the ALJ discounted

Dr. Christopherson's opinion itself, it is important to know *what* opinion

offered by Ms. Larsen conflicts with *what* opinion offered by

Dr. Christopherson.

The ALJ gave "little weight" to Dr. Danks' opinion, as discussed in more

detail above.  AR28.  She also gave "little weight" to Lynne Pesky, a case

manager with a long treatment history with Mr. Freideman.  Id.  Ms. Pesky's

opinion was discounted because her notes did not support her testimony that

Mr. Freideman struggled with putting thought processes together.  Id.  The ALJ

accepted Ms. Pesky's testimony that Mr. Freideman struggles with anxiety and

social settings but, without explanation, the ALJ opined his anxiety and

depression were "not to a disabling degree."

In short, the ALJ discounted to a great degree every mental health

professional who saw Mr. Freideman.  The state agency consultants did not

render opinions about Mr. Freideman's mental impairments nor about his

mental RFC.  Therefore, the court is at a loss to see where the mental RFC

arrived at by the ALJ is supported by any medical evidence.  The mental RFC

must be supported by at least "some" medical evidence.  Lauer, 245 F.3d at

703.

This court has already recommended this case be remanded based on

issues 1-4 raised by Mr. Freideman.  Issue 5, the mental RFC, also merits

remand.  The ALJ must explain what medical evidence she relied upon to arrive

at Mr. Freideman's RFC.  To the extent the ALJ discounts opinions from persons who have provided mental health care to Mr. Freideman, the ALJ must explain *what portions* of those opinions are rejected and *why*.

## I.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Mr. Freideman requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for

good cause was not presented during the administrative proceedings.  Id.
Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with
instructions to award benefits is appropriate "only if the record overwhelmingly
supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding
of an improper denial of benefits, but the absence of overwhelming evidence to
support a disability finding by the Court, out of proper deference to the ALJ the
proper course is to remand for further administrative findings.  Id.; Cox v.
Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence
is overwhelming, but because the record evidence should be developed,
clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345,
356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all
factual issues have been resolved and the record supports a finding of
disability).  Therefore, a remand for further administrative proceedings is
appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, this
magistrate judge hereby respectfully RECOMMENDS that the Commissioner's
decision should be REVERSED and REMANDED for reconsideration pursuant
to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED February 1, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge